*JH*

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE COMPANY, d/b/a AT&T Illinois, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | No. 06 C 2439 (consolidated with 06 C 1919; 06 C 1922; 06 C 2008; 06 C 2436; 06 C 2437 and 06 C 2438) |
| VILLAGE OF ITASCA, ILLINOIS, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Illinois Bell Telephone Company, now AT&T Illinois ("AT&T"), brought suit against the Villages of Itasca, Carpentersville, Roselle, and North Aurora, and the Cities of Wheaton, Geneva, and Wood Dale, asserting violations of state and federal statutory law and violations of plaintiff's constitutional rights. The claims stem from a number of ordinances and actions taken by the municipalities allegedly depriving plaintiff of its rights to use the public rights-of-way for its telecommunications network. Because plaintiff made similar allegations against the municipal defendants, the cases were consolidated. The defendant municipalities now move to dismiss plaintiff's complaints, asserting that plaintiff has failed to state any claim upon which relief may be granted. For the reasons stated herein, we deny in part defendants' motion to dismiss.

## BACKGROUND

In reviewing a motion to dismiss under Rule 12(b)(6), we accept the complaint's well-pleaded factual allegations as true, including the inferences reasonably drawn from them. McDonald v. Household Int'l, 425 F.3d 424, 425 (7th Cir.2005). The complaint should be

dismissed only if the plaintiff "failed to allege any set of facts upon which relief may be granted." Pickrel v. City of Springfield, Ill., 45 F.3d 1115, 1118 (7th Cir.1995). *See also* Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Although we normally do not look beyond the complaint in assessing a motion to dismiss, where, as here, documents are attached to a complaint, we will consider such documents in our determination. Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642, 645 (7th Cir.2006). Therefore, we take the following facts from the plaintiff's complaints and attached ordinances.

In an effort to upgrade its telecommunications network, AT&T developed Project Lightspeed, a $5 billion project to span across 13 states, including Illinois. Project Lightspeed is the most recent phase of AT&T's transition from copper wiring to fiber optic wiring in transporting its telecommunications services. For example, in 1999, AT&T implemented Project Pronto to deploy more fiber optic cable deeper into its network, so as to support Digital Subscriber Line ("DSL")-based communications services, such as high-speed internet access. Project Lightspeed now seeks to expand AT&T's fiber optic network to increase the amount of available bandwidth to residential customers. The upgrade will allow AT&T to provide current telecommunications services, such as voice telephone service, and a bundle of new communications services, including Voice over Internet Protocol ("VoIP"), higher-speed Internet access, and Internet Protocol ("IP") video services (collectively, "IP-based communications services suite"). In order to expand its fiber optic network, AT&T seeks to place additional electronics housed in equipment cabinets ("52B cabinets") as "nodes" near the edge of residential neighborhoods. According to plaintiff, "[t]hese network upgrades will have limited impact on the public rights-of-way that AT&T Illinois's facilities already occupy," and will "result[] in little expected disruption of public convenience." (Itasca

complaint, at ¶ 13; Wheaton complaint, at ¶ 13; Roselle complaint, at ¶ 11; Geneva complaint, at ¶ 12; Wood Dale complaint, at ¶ 13; North Aurora complaint, at ¶ 12; Carpentersville complaint, at ¶ 14).

On April 4, 2006, Itasca passed Ordinance 1304-06, which placed a 180-day moratorium upon the granting of permits for or the construction of any "ground mounted utility installation" ("GMUI"), including the cabinets AT&T was seeking to deploy for the development of Project Lightspeed. The Itasca ordinance defined a GMUI as "any ground mounted utility fixture, cabinet, box, structure, device or appurtenance, including those related to video transmission" that is "powered by stand alone electric service," or that exceeds certain exterior dimensions (50 inches high, by 36.5 inches long, by 17.5 inches wide). Itasca's ordinance, however, expressly excluded "ground mounted electric substations, power off emergency electric generators, ground mounted traffic light control cabinets or utility poles." Because AT&T's 52B cabinets were prohibited under the ordinance, the municipality's action curtailed AT&T's ability to provide its new services and negatively impacted AT&T's ability to enhance its currently provided services. The other municipal defendants, with the exception of Carpentersville, have all enacted similar moratoria.[1] As far as this court can tell, the moratoria ordinances have all expired. It is unclear, however, whether the municipalities are now accepting or thoughtfully considering permit applications. For example, although

---

[1] Wheaton enacted Ordinance F-1151 on April 3, 2006; Wood Dale enacted Ordinance O-06-022 on April 6, 2006; Roselle enacted Ordinance 2006-3224 on March 27, 2006 and extended it an additional 60 days via Ordinance 2006-3259; Geneva enacted a moratorium ordinance on April 17, 2006; and North Aurora enacted Ordinance 06-04-10-02 on April 10, 2006 and extended it to January 21, 2007. Geneva's ordinance differs slightly by excluding "ground mounted electric substations, transformers, electric distribution switches, electric metering cabinets, electric capacitor banks, modcans, power off emergency electric generators, ground mounted traffic light control cabinets, utility poles or such other above or under ground fixtures authorized and/or having obtained necessary permits from the City of Geneva." North Aurora's ordinance also differs in that it covers GMUIs that exceed 45 inches high, 35 inches long, and 15 inches wide.

Roselle's moratorium expired on January 26, 2007, AT&T's applications for three permits to install Project Lightspeed-related equipment, and equipment cabinets, were denied on February 7, 2007, due to this litigation and the expired moratoria.[2]

In addition to the moratoria ordinances, Geneva and North Aurora have also enacted video franchise agreement ordinances, requiring AT&T to obtain the municipality's permission, through a franchise agreement, before upgrading its network and providing its IP video services. And, on January 22, 2007, North Aurora enacted an amendment to its zoning ordinance that requires providers of "communications services" to submit to numerous performance standards, administrative approval requirements, and special use permit or variance application procedures before placing "above ground utility cabinets" in private easements. Plaintiff asserts that such ordinances are contrary to state and federal law and impede their constitutional rights.

Although Carpentersville has not enacted any formal ordinance limiting plaintiff's access to public rights-of-way, in denying permits for or the construction of GMUIs, Carpentersville has effectively adopted a video franchise agreement requirement. Carpentersville denied plaintiff's application for three Project Lightspeed-related permits on March 23, 2006, asserting that AT&T must enter into a cable or video franchise agreement prior to upgrading its network. Plaintiff argues that such an action infringes its rights just as a formal ordinance would do.

Because the municipalities' "obstruction" is allegedly unrelated to the reasonable

---

[2]If the ordinances have expired and any of the municipalities are considering AT&T's permit applications, injunctive relief may be moot. Because, however, we are unclear whether such is the case, and because plaintiff maintains its § 1983 claims, plaintiff's complaints will not be dismissed at this juncture due to mootness.

management of the public rights-of-way under their municipal authority, plaintiff first asserts that defendants are violating plaintiff's statutory right to deploy its facilities in the public rights-of-way under the Illinois Telephone Company Act, 220 ILCS 65/4 ("ITCA"). Second, plaintiff asserts that the municipal ordinances (moratoria, video franchise, and zoning ordinances) are preempted by Section 253 of the Federal Telecommunications Act of 1996, 47 U.S.C. § 253 ("TCA"). Because the municipal ordinances have the effect of completely preventing AT&T from accessing the public rights-of-way to place its new telecommunications cabinets, plaintiff asserts that the ordinances exceed the municipalities' preserved authority under section 253 to manage or regulate their public rights-of-way. Third, and in a similar vein, plaintiff contends that Carpentersville's actions, in addition to the video franchise ordinance enacted by Geneva and North Aurora, are not subject to cable franchise requirements because plaintiff is not a "cable operator," nor is it providing "cable service" as defined by federal and state law.[3] Further, plaintiff claims that Carpentersville's attempt to block the deployment of AT&T's IP-based services is preempted by the Federal Cable Act. Finally, plaintiff asserts violations of its First Amendment, due process and equal protection rights under the United States Constitution pursuant to 42 U.S.C. § 1983, and free speech, due process and equal protection rights under the Illinois constitution. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

---

[3]With respect to the Geneva and North Aurora video franchise ordinances, plaintiff also asserts that the ordinances' provisions requiring plaintiff to pay fees and other consideration to the municipalities for costs associated with the use of public rights-of-way violates Illinois' Telecommunications Infrastructure Maintenance Fee Act and Simplified Municipal Telecommunications Tax Act. 35 ILCS 635/30(a); 35 ILCS 636/5-60(c). Plaintiff's assertions regarding the relationship between the Geneva and North Aurora video franchise ordinances and Section 253 of the Federal Telecommunications Act also differ slightly from the allegations contained in the various other complaints. Finally, plaintiff asserts that North Aurora's zoning ordinance is also preempted by Section 253 of the Federal Telecommunications Act of 1996.

>  jurisdiction thereof to the deprivation of any rights, privileges, or immunities
>  secured by the Constitution and laws, shall be liable to the party injured in an
>  action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Plaintiff asserts that defendants' statutory and constitutional violations

entitle plaintiff to injunctive and other relief, as well as an award of attorneys' fees pursuant

to 42 U.S.C. § 1988.

## DISCUSSION

Illinois Telephone Company Act

Defendants assert that plaintiff has failed to state a sustainable claim under the ITCA.

Specifically, defendants contend that while the ITCA permits telecommunications carriers to

use public land, including public rights-of-way used for utility purposes, the Act also permits

municipalities to regulate such use of public streets. Plaintiff responds by arguing that while

municipalities retain regulatory authority of public rights-of-way under the ITCA, the

defendant municipalities have exceeded their authorized powers.

Because there is very little guidance from Illinois courts in interpreting the ITCA, we

seek to ascertain and give effect to the intent of the legislature. Williams v. Staples, 804 N.E.2d

489, 492-93 (Ill.2004). To do that, we begin with the plain language of the statute, "which is

'the most reliable indicator of the legislature's objectives in enacting a particular law.'" Id.,

at 493 (citing Michigan Ave. Nat'l Bank v. County of Cook, 732 N.E.2d 528 (Ill.2000)). We

assess the words and phrases in light of other relevant provisions, and give reasonable meaning

to all words. Id. We may also consider the "reason and necessity for the law, the evils sought

to be remedied, and the purpose to be achieved." Id. See also People ex rel. Sherman v. Cyrns,

786 N.E.2d 139, 151 (Ill.2003).

The ITCA permits telecommunications carriers to "construct, maintain, alter and

extend its poles, wires, and other appliances as a proper use of highways, along, upon, under and across any highway, street, alley, public right-of-way dedicated or commonly used for utility purposes, or water in this State, but so as not to incommode the public in the use thereof." 220 ILCS 65/4 (2003). The Act goes on to state, however, that "nothing in this act shall interfere with the control now vested in cities, incorporated towns and villages in relation to the regulation of the poles, wires, cables and other appliances." *Id.* The ITCA requires that the telecommunications company give municipal authorities 10- or 30-day notice (depending on whether excavation is necessary) before placing or constructing lines, upon which the municipal authorities have 10 or 25 days to specify the portion of the public right-of-way upon which the line may be placed or constructed. Then, upon receipt of the usable portion of the right-of-way, the telecommunications company must provide municipal authorities with its plans and specifications. *Id.*

While Illinois courts have not specifically defined the limits of municipality power retained under the ITCA, the Illinois Supreme Court has indicated that "municipalities do not have a proprietary interest in the public streets." American Tel. & Tel. Co. v. Village of Arlington Heights, 620 N.E.2d 1040, 1042 (Ill.1993). In Arlington Heights, the Illinois Supreme Court found the defendant municipality in error in its attempt to coerce a telecommunications company into entering a franchise agreement in exchange for use of the public streets. The court based its determination on its previous rulings that municipalities are prohibited from charging rent for the use of city streets and taxing a company for business originating outside the corporate limits of the municipality. *Id.*, at 1044. In explanation, the Arlington Heights court held that "[m]unicipalities do not possess proprietary powers over the public streets. They only possess regulatory powers. The public streets are held in trust for

the use of the public. While numerous powers and rights regarding public streets have been granted to municipalities by the General Assembly, they are all regulatory in character, and do not grant any authority to rent or to lease parts, or all, of a public street." *Id.* As part of its analysis, the Illinois Supreme Court looked to the ITCA (then at Ill.Rev.Stat.1987, ch. 134, par. 20), suggesting that under the Act telephone companies are permitted to use any public ground of the state that is necessary for the extension of its telephone wires or accessories. And while the Arlington Heights court recognized that the ITCA permits municipal consent prior to any such construction or expansion, "the consent of the municipality may not be unreasonably withheld, or refused for an improper reason." *Id.*, at 1046 (citing collection of a toll as an improper reason).

While Arlington Heights deals with a coerced charge to telecommunications companies, we think it gives some insight into the Illinois Supreme Court's understanding of municipalities' authority under the ITCA. The court clearly and definitively distinguished between a proprietary or ownership right over public streets and a right to regulate, limiting municipalities to the latter. Plaintiff's various complaints assert that defendant municipalities have completely deprived plaintiff of use of the public streets and rights-of-way for its telecommunications network. Plaintiff's complaints further assert that its network upgrade will not hinder or obstruct travel or safety on the public ways. Therefore, we find that plaintiff's complaints allege that defendant municipalities have exceeded their authority under the ITCA.

We are further supported in our determination by the language of the statute. The ITCA grants telecommunications carriers the rights to use public streets and rights-of-way so long as they do not "incommode the public in the use thereof." 220 ILCS 65/4 (2003). Plaintiff

has sufficiently alleged the safety and subtlety of its network upgrade, and therefore, its proposed actions fall within the ITCA's protection. We believe that the purpose of the state statute – to protect the rights of telecommunications companies in constructing their telecommunications networks – would be severely hampered if municipalities could restrict those rights altogether under the guise of regulation. *See, e.g.*, <u>Dolson Outdoor Advertising Co. v. City of Macomb</u>, 360 N.E.2d 805 (Ill.App.Ct.1977) (a municipality's zoning powers did not grant authority to prohibit off-premise advertising that was specifically authorized by the Highway Advertising Control Act); <u>Scadron v. City of Des Plaines</u>, 734 F.Supp. 1437, 1449 (N.D.Ill.1990) ("The most consistent reading of the current status of Illinois law is that municipalities may restrict the size of sign faces to a certain extent, but may not forbid them altogether without running afoul of [Highway Advertising Control Act]").

Defendants point to <u>Quilici v. Village of Morton Grove</u>, 695 F.2d 261 (7th Cir.1982), to argue that, by analogy, the ITCA does not prohibit municipalities from regulating utility facilities within their rights-of-way. In <u>Quilici</u>, the Seventh Circuit determined that a municipal ordinance prohibiting handguns did not run afoul of the Illinois or United States Constitutions because "the right to keep and bear arms in Illinois is so limited by the police power that a ban on handguns does not violate that right." 695 F.2d at 267. In drawing an analogy to <u>Quilici</u>, defendants assert that the "moratoria involved in this case are not prohibitions on telecommunications facilities. Rather, they are narrowly constructed ordinances designed for the legitimate purpose of studying whether GMUI's will inconvenience the public and/or affect public safety" (defs' reply at 3). Plaintiff's complaints, however, assert that the moratoria, some of which have been extended formally or informally, are effectively complete prohibitions on the expansion of plaintiff's telecommunications

facilities. Further, the ITCA grants telecommunications companies broad access to public streets and rights-of-way. And unlike section 22's right to bear arms, which, in its plain language, does not include the right to bear handguns, the ITCA grants telecommunications companies the right to place its "poles, wires, and other appliances" on public rights-of-way. We read the ITCA to grant telecommunications companies the right to implement any telecommunications appliance, including the ground mounted utility installations covered by the moratoria. Therefore, we find that plaintiff has sufficiently stated a cause of action under the ITCA.

We turn now to the question of whether plaintiff has sufficiently stated a cause of action under the ITCA with respect to the video franchise ordinances informally adopted by Carpentersville.[4] Carpentersville argues that it could not have violated the ITCA because plaintiff's actions do not fall within the protection of the ITCA. It bases such a claim on its argument that plaintiff is not a "telecommunications provider," but is instead a "cable provider," and the municipality's franchise requirements are predicated on state and federal law regulating cable operators. *See* defs' reply, at 4 ("Clearly, a municipality's franchising authority over the provision of cable television service or video programming within its corporate boundaries would logically extend to the regulation of poles, wires, cables, and other appliances through which such programming is transmitted"). *See also* Carpentersville complaint, Exh. B (Carpentersville denied AT&T's permits for the use of a public right-of-way because "Project Lightspeed will enable residents to receive television services").

_____

[4]North Aurora and Geneva have also enacted video franchise agreement ordinances. In plaintiff's complaints, AT&T contends that those municipalities' video franchise agreement ordinances violate the ITCA. The parties' briefs, however, only deal with Carpentersville's informal policy of requiring a franchise. We believe North Aurora's and Geneva's video franchise agreement ordinances rise and fall with Carpentersville's franchise requirement. Therefore, at this stage our discussion of the Carpentersville franchise requirement applies as well to the North Aurora and Geneva video franchise ordinances.

We read <u>Arlington Heights</u> as limiting a municipality's authority to make public right-of-way access for telecommunications contingent on a franchise agreement. The dispute, however, arises in determining whether plaintiff's proposed expansion of its services to include voice, internet access and video services, authorizes Carpentersville to regulate plaintiff as a cable operator, rather than a telecommunications provider. Unlike regulation of telecommunications providers, Congress, through the Cable Act, provided for the franchising of cable systems by local governmental authorities (47 U.S.C. § 541(a)), and prohibited any cable operator from operating a cable system without a franchise, subject to certain exceptions (47 U.S.C. § 541(b)(1)).

We note at the outset that it is unclear if plaintiff falls within the definition of "cable operator," as defined by the Cable Act. "Cable operator" is defined as "any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. § 522(5). "Cable service" is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6).

While plaintiff does not accede to being a cable operator within the definition of the Cable Act, it does argue that, regardless, municipalities cannot obstruct the deployment of plaintiff's facilities. Essentially, plaintiff argues that even if municipalities could require plaintiff to enter into a franchise agreement prior to providing cable services, it cannot require a franchise prior to placing the facilities associated with providing those services. In <u>National</u>

Cable Television Association, Inc. v. Federal Communications Commission, 33 F.3d 66

(D.C.Cir.1994) ("NCTA"), the District of Columbia Circuit explained how the advent of fiber

optic systems have made it possible to transmit digitized video signals interchangeably, thus

creating opportunity for crossover between two industries that had before been separate –

cable service and telephone service.   In NCTA, the court affirmed the Commission's

determination that neither a telephone company providing video dial tone service nor a video

programmer using video dial tone service to reach subscribers is subject to the cable franchise

agreement of the Cable Act.  Affirming the Commission's decision on multiple grounds, the

NCTA court looked to legislative history and the purpose of the Act to further define sections

of the Cable Act.  For example, relevant to the discussion before us now, the NCTA court

looked to the report of the Committee on Energy and Commerce to determine the meaning of

the term "transmission" in the definition of "cable service."  That report says:

> [N]othing in section 613(b) is intended to prevent a common carrier from
> constructing, subject to applicable law, a local distribution system that is
> capable of delivering video programming and other communications or
> information services to multiple subscribers within a community... Section
> 613(b) prohibits a common carrier from selecting or providing the video
> programming to be offered over a cable system.

NCTA, 33 F.3d at 71 (citing H.R.Rep. No. 934, 98th Cong., 2d Sess. 57 (1984), U.S.Code Cong.

& Admin.News 1984, p. 4655)).  We find that report and the NCTA court's interpretation of

its meaning relevant to the discussion at hand.  At this stage, based on its pleadings, plaintiff

is not a "cable operator" under the terms of the Cable Act because it is not providing the

transmission of video programming.  Right now it is simply constructing a local distribution

system capable of delivering video programming.  Upon provision of video programming, it

will remain to be seen whether or not plaintiff will become a "cable operator" under the terms

of the Act.[5]  We envision a contest at that time, but need not now address a possible future dispute.  Therefore, we find that as is the case with the remaining defendants, plaintiff has sufficiently stated an ITCA cause of action with respect to the Carpentersville defendant.

Preemption

Plaintiff asserts that defendants' various ordinances are preempted by the Federal Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq* ("TCA").  Specifically, plaintiff contends that, pursuant to the Supremacy Clause of the United States Constitution, defendants' ordinances are preempted by section 253 of the TCA.

We begin by assessing plaintiff's standing to sue under the TCA. Defendants argue that the TCA does not provide AT&T with a private right of action, curtailing plaintiff's claims under the Act.  The Seventh Circuit has not yet determined whether the TCA, particularly section 253, provides plaintiff with a private right of action and a split has occurred among the remaining circuit courts.  The Ninth Circuit, for example, has expressly held that there is no private right of action under the TCA.  Sprint Telephony PCS, L.P. v. County of San Diego, ---- F.3d ----, 2007 WL 738493, *16 (9th Cir.2007).  The Sixth Circuit, on the other hand, found a private right of action under § 253(c) of the TCA. TCG Detroit v. City of Dearborn, 206 F.3d 618, 624 (6th Cir.2000).  We need not resolve this dispute as plaintiff's complaints focus on TCA's preemption of local ordinances, and availability of injunctive relief may therefore be sought pursuant to the Supremacy Clause.  Spring Telephony, 2007 WL 738493, at *8.  *See also* Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96, n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal

---

[5]With respect to Geneva and North Aurora, plaintiff asserts in its complaints that plaintiff is not a "cable operator," as defined in Illinois' cable franchise statute. 65 ILCS 5/11-42-11(e) (citing section 602(4) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 522(5)).

statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve"); Bud Antle, Inc. v. Barbosa,  45 F.3d 1261, 1269 (9th Cir.1994) ("Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption").

We turn then to plaintiff's preemption claims.  The TCA was enacted "'to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.'" Voicestream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 828 (7th Cir.2003) (citing Pub.L. No. 104-104, 110 Stat. 56, 56 (1996)).  While the purpose seems clear, the language of the statute has been the subject of much dispute and debate. See AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 397 (1999) ("It would be gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction."); Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Comm'n, 359 F.3d 493, 494 (7th Cir.2004) ("Through the Telecommunications Act of 1996, Congress has had notable success in meeting its goal of fostering competition in the telecommunications industry. But that success has not come without furrowing more than a few brows as lawyers and judges puzzle over the Act's unusual–and unequal–blending of federal and state authority").

Although the Seventh Circuit has yet to interpret the provisions of the TCA relevant to the case at hand, other district and circuit courts have spent significant time and energy discussing the relationship between the subsections of section 253. We begin with the language

of the statute, entitled "Removal of barriers to entry":

> (a) No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

> (b) Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

> (c) Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

> (d) If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253 (1996).

As noted above, the relationship between subsections (a) through (d) has been the subject of much discussion in our sister courts. We are particularly concerned in this case with the relationship between subsections (a) and (c). Two lines of thought have emerged, which are not necessarily contradictory. Looking to the exclusion of subsection (c) from subsection (d), some courts have determined that subsection (c) is a forum selection clause. Specifically, those courts have suggested that subsection (c) creates a private right of action in a federal court for violations of that section. *See* TCG Detroit, 206 F.3d at 624. As we have already concluded, however, we need not determine whether plaintiff has a private right of action, as plaintiff is not seeking individual damages for an alleged violation of the TCA. *See* Puerto

Rico Telephone Co., Inc. v. Municipality of Guayanilla, 450 F.3d 9, 15 (1st Cir.2006).

The second line of thought suggests that subsection (a) "'authorizes preemption of state and local laws and regulations expressly or effectively prohibiting the ability of any entity to provide telecommunications services.'" Puerto Rico Telephone Co., 450 F.3d at 16 (citing Nixon v. Mo. Mun. League, 541 U.S. 125, 128 (2004)). Subsection (c) then is a safe harbor provision that may save a municipality from preemption under section 253. See id., at 19. See also Level 3 Communications, L.L.C. v. City of St. Louis, Missouri, — F.3d —, 2007 WL 313872, *2 (8th Cir.2007); Qwest Communications, Inc. v. City of Berkeley, 433 F.3d 1253, 1255 (9th Cir.2006) ("Berkeley II"); Bellsouth Telecommunications, Inc. v. Town of Palm Beach, 252 F.3d 1169 (11th Cir.2001); City of Auburn v. Qwest Corp., 260 F.3d 1160, 1170 (9th Cir.2001); Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston, 184 F.3d 88, 98 (1st Cir.1999).[6] The Eleventh Circuit, in Bellsouth Telecommunications, explained the four reasons why subsections (b) and (c) must be read as "safe harbors" from subsection (a) – the opening line of subsections (b) and (c); the Federal Communications Commission's ("FCC") interpretation; the legislative history of subsections (b) and (c); and the legislative history of subsection (d). 252 F.3d at 1188-89. We find the Eleventh Circuit's reasoning regarding the relationship between the subsections of section 253 persuasive.

In the footsteps of those courts who have viewed subsection (c) as a "safe harbor" provision, we note that subsection (c) only comes into play upon finding a violation of subsection (a). See, e.g., Bellsouth Communications, 252 F.3d at 1188 ("Consistent with this

---

[6]Earlier case law indicated a third contradictory reading of subsections (b) and (c), wherein courts viewed subsections (b) and (c) as imposing substantive limitations on state and local authority in the telecommunications field, limiting their authority solely to the functions specifically reserved in those subsections. See Bellsouth Telecommunications, 252 F.3d at 1187 (cataloguing cases).

interpretation, if a party seeking preemption fails to make the threshold showing that a state or local statute or ordinance violates (a) because it 'may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service,' the FCC has found it unnecessary to consider whether the statute or ordinance is 'saved' by the exceptions in (b) or (c)"). In order to show a violation of subsection (a), the FCC considers "whether the Ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." In the Matter of California Payphone Assoc., 12 FCC Rcd 14191, 14206 (1997). The Ninth Circuit has held that preemption does not require that a plaintiff show an "actual impact" on the provision of services, but merely that the ordinance "may have the effect of prohibiting the provision of telecommunications services.'" NextG Networks of California, Inc. v. City of San Francisco, 2006 WL 1529990, *4 (N.D.Cal.2006) (citing Qwest Corp. v. City of Portland, 385 F.3d 1236, 1241 (9th Cir.2004)). But see Level 3 Communications,, 2007 WL 313872 at *3 ("Under a plain reading of the statute, we find that a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition").[7] The Ninth Circuit, after reviewing district court cases from Texas and New York and a Fifth Circuit decision, explained, "Taken together, these cases persuasively indicate that a regulatory structure that allows a city to bar a telecommunications provider from operating in the city 'prohibit[s] or ha[s] the effect of prohibiting' the company's ability to provide telecommunications services under 47 U.S.C. § 253(a)." City of Auburn, 260 F.3d

---

[7]Although there is disagreement between the circuits on the level of harm required, plaintiff has successfully pled actual harm. In all of the complaints, plaintiff has indicated that its applications for permits have been denied, or an application would be a futile act. (Itasca complaint, at ¶ 15; Carpentersville complaint, at ¶ 4; Roselle complaint, at ¶ 19; Wood Dale complaint, at ¶ 15; Wheaton complaint, at ¶ 15; North Aurora complaint, at ¶ 16; Geneva complaint, at ¶ 16).

at 1176. We have no doubt that plaintiff has sufficiently pled a violation of section 253(a) with respect to all of the ordinances at issue. *See* Itasca complaint, at ¶ 1 ("The Village's ordinance deprives AT&T Illinois of its rights to use the public rights-of-way for its telecommunications network, and is contrary to law"); Carpentersville complaint, at ¶ 25 ("The Village's actions go far beyond the Village's power to engage in reasonable and ordinary management of the public rights-of-way. The Village instead seeks to prevent AT&T Illinois from accessing the public rights-of-way altogether. Under Section 253(a), the Village's actions do not constitute legitimate rights-of-way regulation, but rather amount to an unlawful attempt to stop AT&T Illinois's deployment in the public rights-of-way of facilities that will be used to provide telecommunications services").

As plaintiff has successfully pled a violation of section 253(a), we must now consider whether the municipalities' ordinances and actions fall within the safe harbor provision of subsection (c). The Ninth Circuit, in a series of well-reasoned opinions, established that the right to "manage the public rights-of-way" contained in § 253(c) authorizes municipalities control over the right-of-way itself, not control over companies with facilities in the right-of-way. *See* Berkeley II, 433 F.3d at 1256; City of Auburn, 260 F.3d at 1177 (9th Cir.2001); NextG Networks, 2006 WL 1529990 at *7; Cox Communications PCS, L.P. v. City of San Marcos, 204 F.Supp.2d 1260, 1266 (S.D.Cal.2002). The Ninth Circuit explained its rationale, pointing to statements of the FCC and the legislative history of the TCA. Specifically, the FCC stated:

> [S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way.... [T]he types of activities that fall within the sphere of appropriate rights-of-way management...include

> coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

City of Auburn, 260 F.3d at 1177 (citing In re TCI Cablevision of Oakland County, Inc., 12

F.C.C.R. 21396 (F.C.C.1997)). The City of Auburn court went on to quote Senator Dianne

Feinstein during the floor debate on § 253(c), who indicated that Congress intended to permit

the following under § 253(c):

> (1) 'regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;' (2) 'require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies;' (3) 'require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;' (4) 'enforce local zoning regulations;' and (5) 'require a company to indemnify the City against any claims of injury arising from the company's excavation.'

Id., at 1177-78 (citing In re Classic Telephone, Inc., 11 F.C.C.R. 13082 (F.C.C.1997), ¶ 39

(quoting 141 Congr. Rec. S8172 (daily ed. June 12, 1995) (statement of Sen. Feinstein, quoting

letter from the Office of City Attorney, City and County of San Francisco)).

Again we find the Ninth Circuit's rationale persuasive and look to the challenged

ordinances to determine whether they do, in fact, attempt to manage the rights-of-way or

whether they are impermissibly attempting to regulate the companies. We turn first to the

moratorium ordinances. At first glance, the moratoria seemingly regulate the public rights-of-

way, simply placing a ban on the GMUIs that measure above a certain size. Such a measure

appears to fall directly within the authority spoken of by Senator Feinstein. We take pause,

however, because the definition of prohibited GMUIs specifically excludes electric substations,

power off emergency electric generators, and ground mounted traffic light control cabinets or

utility poles.[8] This seems to fly in the face of public right-of-way management, and could be seen as an attempt to limit telecommunications expansion, which is directly contrary to the purpose of the TCA. While the municipalities may have a valid reason for making such exclusions, we draw all inferences in favor of plaintiff at this point, and therefore, find that plaintiff has successfully pled a violation of § 253(a), not saved by § 253(c), with respect to the moratorium ordinances.

We turn now to the franchise agreement requirement in the Carpentersville complaint.[9] Plaintiff brings three related claims against Carpentersville. In Count I, plaintiff alleges that Carpentersville's attempt to stop AT&T from deploying its facilities is preempted by Section 253 of the TCA. In Count IV, plaintiff asserts that AT&T's provision of IP-based voice, data, and video services is not subject to cable franchising under federal law. And, finally, Count V alleges that Carpentersville's attempt to block AT&T's provision of IP-based voice, data, and video services, unless AT&T obtains a franchise, is preempted by the Federal Cable Act and other provisions of the Federal Communications Act of 1934. Underlying all three counts is the issue of defining plaintiff's services, either as "telecommunications services," "cable services," or "information services."

Under the Communications Act of 1934, as amended, the term "telecommunications service" means "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46). "Telecommunications" is defined as "the transmission, between or

---

[8]We take these exclusions from the Itasca ordinance. The remaining challenged moratorium ordinances create similar exclusions.

[9]Once again, Carpentersville's franchise is seemingly similar to the franchise requirements of North Aurora and Geneva. Thus, where relevant, the Carpentersville discussion applies with equal force to those complaints.

among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). The term "cable service" means "(A) the one-way transmission to subscribers of (i) video programing, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6). The term "cable operator" means "any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. § 522(5). And the term "information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).

We find it impossible to define plaintiff's services at this stage. In its complaint, plaintiff alleges that its upgraded network – blocked by Carpentersville for failure to enter into a franchising license – "will enable AT&T Illinois to provide a bundle of IP-based communications services that includes, in addition to telecommunications services that AT&T Illinois has provided to customers for years, an Internet Protocol-based voice service known as 'VoIP' service, a significantly faster Internet access service, and an IP video service" (Carpentersville complaint, at ¶ 14). The complaint alleges that plaintiff's architecture will remain "fundamentally two-way architecture" that will provide its customers a "highly

interactive, two-way service that will provide each customer a unique, individualized data stream" (*id.*, at ¶ 17). We find that such allegations are sufficient, at least for now, to place plaintiff's IP-based services outside the definition of "cable services" in the Cable Act. And while we are unclear whether such a finding will hold in the future, for now we leave the evidentiary dispute regarding the definition of plaintiff's services to another day. *See* <u>Pacific Bell Telephone Company d/b/a AT&T California v. City of Walnut Creek</u>, 428 F.Supp.2d 1037, 1045 (N.D.Cal.2006) ("Whether AT&T's video programming in fact is a two-way interactive service is an evidentiary matter to be addressed in future proceedings").

That determination deals with Count IV – defendants' motion to dismiss Count IV is denied. The next question is whether either Section 253 of the TCA or the Cable Act preempts Carpentersville's local authority to require plaintiff to enter into a franchise agreement. First, we find that if plaintiff's IP-based services do constitute "telecommunications service" under the TCA, Carpentersville's actions require an analysis similar to the one we did for the moratorium ordinances. Section 253(c) does allow municipalities to require "fair and reasonable compensation from telecommunications providers," as long as the franchise requirements are done "on a competitively neutral and nondiscriminatory basis." Therefore, it is patently clear that a franchise requirement is not *per se* preempted by the TCA. *See* <u>Pacific Bell Telephone Co. v. California Dept. of Transp.</u>, 365 F.Supp.2d 1085, 1090 (N.D.Cal.2005). A franchise requirement will be preempted, however, if the compensation costs charged "have or may 'materially inhibit' the provision of services." *Id.* (internal citations omitted). We do not think this is a question that can possibly be determined on the pleadings, and we therefore deny defendants' motion to dismiss with respect to the franchise requirements. *See* <u>Qwest Communications Corp. v. City of Berkeley</u>, 208 F.R.D. 288 (N.D.Cal.2002) ("Berkeley I")

(coverage under the TCA and effect of prohibiting provisions in city ordinance were not to be decided on the pleadings). Therefore, we decline to dismiss plaintiff's Count I at this time.

Finally, we turn to Count V. We begin by noting that the Cable Act not only permits Carpentersville to require a cable operator to enter into a franchise agreement prior to providing cable services, but prohibits a cable operator from providing cable service without a franchise. 47 U.S.C. § 541(b)(1). Plaintiff's complaint indicates that it seeks to lay the groundwork and set up the equipment to provide a number of services, including cable and telecommunications services. So we are left to determine whether the Cable Act preempts local ordinances or rules that would require franchise requirements for "mixed-use" facilities. Section 541(a)(1) of the Cable Act states: "A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise." In its essence, Section 541(a)(1) is designed to enhance cable competition and remove barriers to entry.

Like the TCA, the Cable Act is part of the Federal Communications Act of 1934. As we have previously suggested in this opinion, whereas cable operators and telecommunications providers are treated differently under the different sections of the Communications Act, new technology and fiber optic wiring have blurred the line between a telecommunications provider and cable operator, especially when it comes to franchising authority.    The Federal Communications Commission explains:

> The Communications Act sets forth the basic rules concerning what franchising authorities may and may not do in evaluating applications for competitive franchises. Despite the parameters established by the Communications Act, however, operation of the franchising process has proven far more complex and time consuming than it should be, particularly with respect to facilities-based

telecommunications and broadband providers that already have access to rights-of-way. New entrants have demonstrated that they are willing and able to upgrade their networks to provide video services, but the current operation of the franchising process at the local level unreasonably delays and, in some cases, derails these efforts due to [local franchising authorities]' unreasonable demands on competitive applicants. These delays discourage investment in the fiber-based infrastructure necessary for the provision of advanced broadband services, because franchise applicants do not have the revenues from video services to offset the costs of such deployment. Thus, the current operation of the franchising process often not only contravenes the statutory imperative to foster competition in the multichannel video programming distribution ("MVPD") market, but also defeats the congressional goal of broadband deployment.

In re Implementation of Section 621(a)(1) of the cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992, MB Docket No. 05-311, ¶ 3 (March 5, 2007) ("FCC Order").

In an effort to provide guidance with regard to § 541(a)(1), the FCC, in the above order, laid out a set of rules regarding franchising authority. The FCC explicitly preempted local rules "to the extent that they conflict with this Order or stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." FCC Order, at ¶ 125. With respect to "mixed-use" networks, the FCC held:

We clarify that LFAs' jurisdiction applies only to the provision of cable services over cable systems. To the extent a cable operator provides non-cable services and/or operates facilities that do not qualify as a cable system, it is unreasonable for an LFA to refuse to award a franchise based on issues related to such services or facilities. For example, we find it unreasonable for an LFA to refuse to grant a cable franchise to an applicant for resisting an LFA's demands for regulatory control over non-cable services or facilities. Similarly, an LFA has no authority to insist on an entity obtaining a separate cable franchise in order to upgrade non-cable facilities. For example, assuming an entity (e.g., a LEC) already possesses authority to access the public right-of-way, an LFA may not require the LEC to obtain a franchise solely for the purpose of upgrading its network. So long as there is a non-cable purpose associated with the network upgrade, the LEC is not required to obtain a franchise until and unless it proposes to offer cable services. For example, if a LEC deploys fiber optic cable that can be used for cable and non-cable services, this deployment alone does not trigger the obligation to obtain a cable franchise. The same is true for boxes housing

infrastructure to be used for cable and non-cable services.

*Id.*, at ¶ 121. Plaintiff has clearly alleged that its upgrade will include cable and non-cable services. (*See* Carpentersville complaint, at ¶ 2) ("This upgraded network will enable AT&T Illinois to provide both telecommunications services that AT&T Illinois already provides today, such as voice telephone service, and a bundle of new communications services, including Voice over Internet Protocol ('VoIP'), a significantly faster Internet access service ("HSIA"), and Internet Protocol ('IP') video services (collectively, the 'IP-based communications services suite')). Therefore, under the FCC's recent ruling plaintiff need not enter a cable franchise agreement until it actually proposes to offer cable service. Therefore, at this time plaintiff retains a preemption claim under the Cable Act, Section 541(a)(1).

Such a finding is not inconsistent with <u>City of Walnut Creek</u>, 428 F.Supp.2d 1037, a case cited by defendants in opposition to plaintiff's preemption claims. First, we note that <u>City of Walnut Creek</u>, and the case on which it relies (<u>City of Dallas, Texas v. Federal Communications Commission</u>, 165 F.3d 341 (5th Cir.1999)), were decided before the FCC Order quoted above. Second, we note that the plaintiff in <u>City of Walnut Creek</u> had been granted a permit to conduct its line conditioning work and had in fact completed the necessary work. *See* <u>City of Walnut Creek</u>, 428 F.Supp.2d at 1044. Such is not the case here. Plaintiff has sufficiently alleged that it has been stopped from performing its upgrade – an upgrade that would enhance both cable and non-cable services – because it would not enter a franchise agreement. Such is clearly at odds with the FCC Order. Because the FCC has "the authority to 'execute and enforce' the Communications Act, § 151, and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act, § 201(b) (<u>National Cable & Telecommunications Assoc. v. Brand X Internet Services</u>, 545 U.S. 967, 980-81 (2005)),

the FCC is given authority to fill in statutory gaps and promulgate binding legal rules. *Id.* Therefore, we treat the FCC's rules with deference and apply them to the case at hand.

Finally, in an attempt to remove plaintiff's claims from the preemptive scope of the TCA, defendants argue that plaintiff's provision of services are "information service," as opposed to "telecommunications services." As noted above, "information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20). Unlike telecommunications service providers, information service providers are not subject to regulation as common carriers under the Communications Act. Information service providers are, however, subject to regulation by the FCC under the Commission's Title I ancillary jurisdiction. Brand X, 545 U.S. at 975-76.

At this stage we see several problems with classifying plaintiff's services as information services. First, the verb in the definition is "offering." The Supreme Court, in Brand X, spent significant energy defining "offering." Ultimately, the Court concluded:

> What cable companies providing cable modem service and telephone companies providing telephone service 'offer' is Internet service and telephone service respectively – the finished services, though they do so using (or 'via') the discrete components composing the end product, including data transmission.

Brand X, 545 U.S. at 990. As we noted above, plaintiff is simply seeking to place its facilities on defendants' public rights-of-way. Plaintiff is not at this time offering any services, much less information services.

Second, as also noted above, we find that the determination of the kind of services

provided by plaintiff's proposed Project Lightspeed is ultimately a question of fact not fit for resolution at this stage. *See, e.g.*, Berkeley II, 208 F.R.D. 288 (N.D.Cal.2002).

Finally, the purpose behind the FCC's and Supreme Court's determination that Congress "intended to maintain a regime in which information service providers are not subject to regulation as common carriers merely because they provide their services 'via telecommunication'" (In the Matter of Federal-State Joint Board on Universal Service, 13 F.C.C. Rcd. 11501, 11507 (1998)), was an effort to further the goals of competition and deregulation. Therefore, because Carpentersville's franchise requirements work against those goals, we think it conceivable that plaintiff could maintain a preemption claim against defendants, even if its services are deemed "information services." Therefore, we decline to dismiss plaintiff's preemption claims against Carpentersville under the Communications Act, including the TCA and the Cable Act.

With regard to preemption, one issue remains: are plaintiff's preemption claims foreclosed by the Tenth Amendment? Defendants' Tenth Amendment arguments focus on the TCA, and suggest that "the relief AT&T requests would require an interpretation that Congress, through § 253(a), has mandated that municipalities grant all permits sought by telecommunications companies to build any and all utility cabinets on municipal rights of way, regardless of other considerations and in any manner within any zoning district" (defs' brief, at 16). Plaintiff responds by asserting that Congress specifically preempted areas traditionally regulated by states through the enactment of the 1996 TCA and § 253.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Tenth Amendment prohibits Congress from commanding the states to

pass or enforce laws or compelling states to enact or administer a federal regulatory program. New York v. United States, 505 U.S. 144, 155-57, 188 (1992). Where, however, Congress acts within the scope of the Commerce Clause, it may "offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id.*, at 173-74. Because Congress passed the Communications Act of 1934 and the Federal Telecommunications Act of 1996 pursuant to its Commerce Clause powers, the application of § 253 does not offend the principles of the Tenth Amendment. *See* City of Bristol, Virginia v. Earley, 145 F.Supp.2d 741, 750 (W.D.Va.2001). *See also* Cellular Phone Taskforce v. F.C.C., 205 F.3d 82, 96-97 (2d Cir.2000) (regulation of personal wireless service facilities under the Communications Act does not run afoul of the Tenth Amendment); Bell Atlantic-Pennsylvania, Inc. v. Pennsylvania Public Utility Comm'n, 295 F.Supp.2d 529, 539 (E.D.Pa.2003) (regarding Section 252(e)(4)); Verizon Maryland Inc. v. RCN Telecom Services, Inc., 232 F.Supp.2d 539, 557-58 (D.Md.2002) (regarding § 252); Qwest Broadband Services, Inc. v. City of Boulder, 151 F.Supp.2d 1236, 1245-46 (D.Colo.2001) (regarding § 541).[10]

First Amendment

We next turn to plaintiff's First Amendment claims, brought pursuant to 42 U.S.C. §

---

[10]Defendants cite to Petersburg Cellular Partners v. Board of Supervisors of Nottoway County, 205 F.3d 688 (4th Cir.2000), to argue that "any interpretation of § 253(a) in this case that ignores the safe harbor provisions of § 253(c) would result in this Court having to interpret § 253(a) as a Congressional preemption mandating municipalities to use their zoning and permitting power in a specific way" (defs' motion at 16). By denying defendants' motion to dismiss plaintiff's TCA preemption claims, we do not ignore the safe harbor provision. At this stage we simply take plaintiff's complaint as true and draw reasonable inferences, one of which is that defendant municipalities have overstepped the authority granted them in the safe harbor provision, in plaintiff's favor. As we noted above, it is possible to read plaintiff's complaints to allege that defendants have impermissibly attempted to regulate the companies, instead of regulating the rights-of-way. Therefore, our determination does not run afoul of the Tenth Amendment.

1983.[11] Although the moratorium ordinances, various other ordinances, and Carpentersville's actions differ in structure and scope, plaintiff's allegations with respect to the First Amendment are nearly identical. Plaintiff asserts that the municipalities have unlawfully abridged plaintiff's right to free speech, the municipalities' actions run counter to federal policies, and the ordinances and actions fail to further an important or substantial governmental interest. Further, plaintiff asserts that even if the moratorium defendants' actions did further important or substantial governmental interests, their absolute ban on plaintiff's access to the public rights-of-way to deploy 52B cabinets is far greater than essential to further such interests.

The First Amendment states that "Congress shall make no law...abridging the freedom of speech." In essence, the First Amendment ensures that the government has no authority to restrict expression due to its message, ideas, subject matter, or content. Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002). Although the First Amendment represents a "national commitment to the free exchange of ideas," it is not an absolute right (id.), and is "not so all-encompassing as to include all activity in which an idea, goal or value is promoted." C.L.U.B. v. City of Chicago, 157 F.Supp.2d 903, 915 (N.D.Ill.2001).

Nor does the First Amendment protect every conceivable type of communication. For example, in C.L.U.B., the district court noted, "The operation of a business, including a charitable business, is subject to zoning laws, even if the business makes its money by engaging

---

[11]The Itasca, Wheaton, Wood Dale, Roselle, Geneva, and North Aurora complaints allege a violation of plaintiff's First Amendment rights under the United States Constitution based on the moratorium ordinances. Additionally, the Roselle complaint alleges First Amendment violations based on the Village's permit denial; the North Aurora complaint alleges First Amendment violations based on the Village's video franchise ordinance and zoning amendment; the Geneva complaint alleges First Amendment violations based on its video franchise ordinance; and the Carpentersville complaint alleges a First Amendment violation based on the Village's attempt to prohibit AT&T from deploying its telecommunications facilities. While the North Aurora complaint also makes a claim under the Free Speech Clause of the Illinois Constitution, because the analysis at this point would be similar to that under the First Amendment of the United States Constitution, and neither party addressed the Illinois claim separately, we decline to address it in separate analysis.

in conduct within the core of the First Amendment. When the object of the law is unrelated to expression, *e.g.* harmonious land use here, the free speech clause is not implicated, even if the law in question limits the ability to disseminate one's message." *Id.*, at 915-16. Here, defendants contend that plaintiff's access to the public rights-of-way is one type of communication unprotected by the First Amendment. Specifically, defendants assert that AT&T merely sells transmission, rather than offering a collection of content, and therefore, falls outside of First Amendment protection.[12] Defendants reject plaintiff's characterization of AT&T's actions as protected speech analogous to the protected speech of cable or satellite providers. While defendants do not dispute that cable and satellite providers are entitled to First Amendment protection (*see* Turner Broadcasting System, Inc. v. F.C.C., 512 U.S. 622, 636 (1994) (through "'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats'") (internal citations omitted); Satellite Broadcasting And Communications Ass'n v. F.C.C., 275 F.3d 337, 352-53 (4th Cir.2001); Comcast Cablevision of Broward County, Inc. v. Broward County, Fla., 124 F.Supp.2d 685, 690-91 (S.D.Fla.2000)), defendants assert that plaintiff's proposed erection of its facilities to provide its enhanced services is more analogous to the unprotected action of erecting newsstands. Defendants point to Graff v. City of Chicago, 9 F.3d 1309 (7th Cir.1993), to argue that such action is merely conduct, and not speech protected by the First Amendment. We believe the defendants have misread the majority in Graff. Sitting *en banc* in Graff, the

---

[12]There is no real dispute that the ordinances are "content-neutral," as opposed to "content-based," ordinances. There to Care, Inc. v. Commissioner of Indiana Dept. of Revenue, 19 F.3d 1165, 1168 (7th Cir.1994) ( "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.... Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech'") (internal citations omitted).

complex First Amendment analysis produced a splintered court and four opinions. The plurality opinion did suggest that the erection of newsstands on public property was conduct that fell outside the protections of the First Amendment. The plurality did not end the discussion there, however, and determined that, even if plaintiff's conduct was protected speech, the ordinance was a valid time, place, or manner restriction that did not run afoul of plaintiff's First Amendment rights. The Graff plurality was composed of five of the twelve judges that heard the case. The remaining seven, in three separate opinions, all indicated that the erection of a newsstand was in fact protected conduct under the First Amendment. Graff, 9 F.3d at 1328 (Flaum, J., concurring) ("A newsstand is an instrument for the dissemination of expressive materials, and as such it falls within that special category of activities whose regulation implicates First Amendment values"); id., at 1334 (Ripple, J., concurring) ("This case does involve a First Amendment interest); id., at 1337 (Cummings, J., dissenting) ("The stand is an implement of commerce that facilitates the vendor's free speech"). Extrapolating from Graff, the Seventh Circuit has since stated that "the written word, or anything closely associated with it, constitutes expression." Weinberg v. City of Chicago, 310 F.3d 1029, 1045 (7th Cir.2002) (indicating that a plurality of judges in Graff determined that the maintenance of a newspaper stand qualifies as conduct commonly associated with expression).

Taking Graff, along with the number of cases holding that cable and satellite companies are protected by the First Amendment, we determine that plaintiff has sufficiently alleged that its proposed conduct is protected under the First Amendment. See Comcast Cablevision of Broward County, Inc. v. Broward County, Fla., 124 F.Supp.2d 685, 692 (S.D.Fla.2000) ("Liberty of circulating is not confined to newspapers and periodicals, pamphlets and leaflets, but also to delivery of information by means of fiber optics, microprocessors and cable").

We must now determine whether the ordinances constitute reasonable time, place, and manner restrictions, and thus are viable under the First Amendment. Plaintiff asserts that the ordinances fail to further any conceivable government interest, and, even if they do further a government interest, the ordinances are not narrowly tailored to achieve such an interest. Thus, plaintiff contends that the ordinances fail the test articulated in United States v. O'Brien, 391 U.S. 367 (1968). *See also* Graff, 9 F.3d at 1319 ("If the government seeks to control speech without reference to viewpoint, ordinances can contain reasonable time, place and manner restrictions. These restrictions, however, must serve significant government interests (narrowly tailored) and leave alternative avenues to communicate the same information").

Because defendants did not respond to plaintiff's argument under O'Brien, the municipalities have not explicitly stated their purported substantial government interests. While we do recognize that local governments generally have a substantial interest in policing the rights-of-way in order to decrease congestion and increase safety, we decline to uphold the ordinances on the pleadings. See Graff, 9 F.3d at 1322 (assessment of the constitutionality of an actual statute normally is undertaken in the summary judgment stage). Plaintiff has sufficiently pled a lack of government interest. (*See, e.g.*, Itasca complaint, at ¶ 38). Such will suffice at this stage in the litigation.

Due Process

With regard to the moratoria, plaintiff also seeks recovery pursuant to § 1983 for violations of its due process rights under the United States and Illinois constitutions.[13] Although plaintiff incorporates sections of its complaint into its due process claim, the only allegation

---

[13]We treat the federal and state due processes challenges together. Jones v. Harris, 1989 WL 24132, *3 (N.D.Ill.1989).

specific to the due process claim states: "The Village's Ordinance has deprived AT&T Illinois of rights, privileges, and immunities secured by the Due Process Clause, in that the Village's decision to block some, but not all, utility cabinets that exceed a certain size, and without regard to the proposed use or placement of the banned cabinets, was unfair, arbitrary and capricious, and lacking in a rational basis." (Itasca complaint, at ¶ 46. *See also id.*, at ¶ 64).[14]

The Fourteenth Amendment to the United States Constitution states that no state shall "deprive any person of life, liberty, or property, without due process of law...." Violations of such a prohibition raise two kinds of claims: substantive due process and procedural due process. To sufficiently state a violation of either substantive or procedural due process, plaintiff must allege that it had a "property interest," and that it was deprived of that interest without due process of law. Phelan v. City of Chicago, 347 F.3d 679, 681 (7th Cir.2003). Substantive due process inquires as to whether the government had sufficient justification for the deprivation of such property or liberty. Procedural due process inquires as to whether sufficient process (*i.e.*, notice and hearing) was afforded prior to deprivation of such property or liberty.

It is unclear from plaintiff's complaint whether it is asserting a violation of its substantive and/or procedural due process rights. From its opposition brief, plaintiff is seemingly asserting a right to the use of its private property and a right to use of the public rights-of-way under the ITCA. Regarding the former, plaintiff asserts, "To the extent AT&T seeks to place GMUIs on private property that it owns, leases, or in which it has acquired a private easement, the moratoria thus clearly deprive AT&T of a cognizable property interest."

---

[14]We quote Itasca's complaint as representative language from the various complaints consolidated in this action, with the exception of Carpentersville.

(plf's response, at 22). Defendants request that we dismiss a claim based on deprivation of such private property, as plaintiff has failed to specifically allege that it intends to build its 52B cabinets on private property. While general allegations of injury are generally acceptable at the pleading stage (Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)), the individual defendants are entitled to some notice as to whether plaintiff has specific private property deprivation claims against them. For example, plaintiff may have been denied its due process rights to place GMUIs on its private property in one or two defendant municipalities, but not all. Plaintiff's private property due process claims are thus dismissed with leave to amend to place each individual defendant on notice of such potential claims.

Plaintiff also suggests that it has property rights in the public rights-of-way arising from the ITCA.[15] In support of such a contention, plaintiff cites to Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1972). In Roth, the Supreme Court found that plaintiff did not have a property interest in his year-to-year employment under the terms of the Fourteenth Amendment. In arriving at that determination, the Roth Court discussed the boundaries of plaintiff's procedural due process rights – rights that arise only where plaintiff has a "legitimate claim of entitlement" to the property, the dimensions of which are "defined by existing rules or understandings that stem from an independent source such as state law." Roth, 408 U.S. at 577. Here, plaintiff asserts that its claim of entitlement arises from the ITCA. While plaintiff's complaints contain no actual allegations that the ITCA grants plaintiff an entitlement to access of the public rights-of-way, we take a brief look at the statute to determine whether such a claim may stand. Plainly, the ITCA "authorizes" telecommunications carriers

---

[15]We note at the outset that a violation of state law is not in itself a violation of the Constitution. Kim Construction Co, Inc. v. Board of Trustees of the Village of Mundelein, 14 F.3d 1243, 1249 (7th Cir.1994).

to utilize the public rights-of-way. 220 ILCS 65/4. And although such authorization is explicitly limited by the "control now vested in cities, incorporated towns and villages in relation to the regulation of the poles, wires, cables and other appliances" *(id)*, we could imagine a scenario where abuse of a municipality's discretion under the ITCA could create a due process violation. Essentially an alternative way to state its ITCA claim, because the ITCA entitles access to public rights-of-way, plaintiff's assertion that the defendant municipalities exceeded their authority under the state statute may create a cognizable due process claim.

Because plaintiff may be able to successfully allege a claim for its use of private land,[16] we dismiss plaintiff's due process claims with respect to private land, with leave to amend.[17] We decline to dismiss plaintiff's due process claim stemming from alleged violation of the ITCA.

## Equal protection

Finally, plaintiff asserts violations of its equal protection rights under the United States and Illinois Constitutions. Specifically, plaintiff alleges that "[t]he Village's Ordinance is discriminatory in that it blocks some, but not all, utility cabinets that exceed a certain size, and without regard to the proposed use or placement of the banned cabinets" (Itasca complaint, at

---

[16]The liberty to use one's own land does constitute a protected property right within the meaning of due process. *See* River Park, Inc. v. City of Highland Park, 23 F.3d 164 (7th Cir.1994).

[17]In addition, there is a possibility that plaintiff may have a due process claim for alleged violation of its free speech rights. *See* Roth, 408 U.S. at 575, n14 ("When a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards"). While it is unclear just exactly what plaintiff is challenging, if it is challenging the constitutionality of the ordinances as they apply to telecommunications and free speech, it may have a potentially viable claim. *See* C.L.U.B. v. City of Chicago, 1997 WL 94731, *2-3 (N.D.Ill.1997) (denying defendant's motion to dismiss plaintiffs' due process claim because "[t]he adequacy of state and local remedies does not necessarily defeat a due process claim when, as here, the exercise of plaintiffs' constitutionally protected liberty interests – particularly the free exercise of religion – is at stake"). Because neither plaintiff's complaints nor its brief indicates such allegations, we will not assume plaintiff meant to include them.

¶ 14). Plaintiff continues, "[t]hese distinctions are not tailored to any legitimate justification" (*id.*; *see also id.*, ¶ 68).[18]

Because equal protection challenges brought under the Illinois and United States Constitutions are evaluated under the same standards (<u>C.L.U.B. v. City of Chicago</u>, 157 F.Supp.2d 903, 910, n4 (N.D.Ill.2001)), we need not address them as distinct claims. The Fourteenth Amendment prohibits states from "deny[ing] any person within its jurisdiction the equal protection of the laws." The Supreme Court has noted that the Equal Protection clause is "essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985). Equal protection analysis is divided into three categories: (1) strict scrutiny, which requires that the classification be narrowly tailored to a compelling state interest; (2) intermediate scrutiny, which requires that the classification be substantially related to an important state interest; and (3) rational review, which requires that the classification be rationally related to a legitimate state interest. The first category applies to protected classes – race, alienage, or national origin – or impingement on personal rights guaranteed by the Constitution. *Id.*, at 440. The second category applies to "quasi-suspect" classes, such as gender. *Id.*, at 441. Finally, the third category applies to all other classifications – under rational review, legislation is presumed to be valid. *Id.*, at 440.

Plaintiff asserts that the moratorium ordinances are discriminatory because they allow certain GMUIs of a certain size and prohibit others of a similar size. Thus, plaintiff contends that the ordinances discriminate against all persons who seek to place the outlawed GMUIs within the municipal limits. Neither party asserts that the classification contained within the ordinances discriminates against a protected class. Nor, as far as we can tell, is plaintiff

---

[18]Again, we use the Itasca complaint to begin our analysis.

asserting that its constitutional rights have been impinged.[19]  Therefore, any analysis will be under a rational basis review.

Because the ordinances clearly distinguish between certain excluded GMUIs (ground mounted electric substations, power off emergency electric generators, ground mounted traffic light control cabinets or utility poles) and all other GMUIs of a certain size, there is some classification.  It is unclear at this stage what basis the municipalities have for treating certain GMUIs differently than other GMUIs.  Therefore, because plaintiff sufficiently alleged that defendants did not tailor their distinctions to a legitimate justification, plaintiff has successfully pleaded an equal protection claim and we will not dismiss it at this stage. *See* May v. Sheahan, 226 F.3d 876, 882 (7th Cir.2000) (only after the court can assess the strength and nature of security concerns could the court determine whether an equal protection claim should be dismissed for failing to meet the rational basis test); Carr v. Village of Willow Springs, 2002 WL 1559665, *3 (N.D.Ill.2002) ("This allegation, in and of itself, is sufficient to state a claim of a violation of Carr's right to equal protection because he alleges that Schultz's vindictive treatment was not related to a legitimate objective").

Attorneys' Fees

In conjunction with its claims of constitutional violations, plaintiff asserts that this court should award plaintiff attorneys' fees pursuant to 42 U.S.C. § 1988.  Section 1988 states that

---

[19]Although plaintiff does assert, and we have upheld for the time being, violation of its First Amendment rights, plaintiff fails to assert that its Equal Protection challenge is at all related to its constitutionally-protected right to free speech.  While plaintiff may have such a claim (*see* Police Dept. of City of Chicago v. Mosley, 408 U.S. 92 (1972) (city ordinance prohibiting all picketing within 150 feet of a school, except for any peaceful picketing of any school involved in a labor dispute, is unconstitutional under the Fourteenth Amendment)), neither plaintiff's complaint nor its brief implies such a theory.  In fact, plaintiff's complaint specifically alleges violation of equal protection under a rational basis review.  Therefore, again, we will not assume plaintiff meant to include such a claim.

"any action proceeding to enforce a provision of sections...1983...of this title,...the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." Defendants cite to two cases, <u>Primeco Personal Communications, Ltd. Partnership v. City of Mequon</u>, 352 F.3d 1147 (7th Cir.2003) and <u>City of Rancho Palos Verdes, California v. Abrams</u>, 544 U.S. 113 (2005), to argue that attorneys' fees are unavailable for violations of the TCA. We do not necessarily disagree, but remind defendants that plaintiff has successfully pled violations of its First and Fourteenth Amendment rights, rights that were not at issue in defendants' cited cases. Because "the prevailing party in a section 1983 suit is entitled by 42 U.S.C. § 1988, more or less as a matter of course" (<u>Primeco</u>, 352 F.3d at 1152), and plaintiff successfully pled violations of its constitutional rights under § 1983, we decline to dismiss plaintiff's § 1988 attorneys' fees claims at this time.

CONCLUSION

For the reasons stated herein, we grant defendants' motion to dismiss plaintiff's due process claims with respect to private property and deny the remainder of defendants' motion to dismiss.

JAMES B. MORAN
Senior Judge, U. S. District Court

May 25, 2007.